PINK HINES, ALIAS PATE BURTON, V. THE STATE.

No. 1763. Decided December 7, 1898.

**1. Alibi—Charge.**

A charge upon alibi is sufficient which instructs the jury: "If you entertain a reasonable doubt as to whether defendant was present at the time and place when and where said E. M. was killed, then find said defendant not guilty."

**2. Charge—Singling Out Particular Facts.**

There is no rule which requires the court to single out each of the different facts that tend to identify or connect a party with a crime and charge upon each separately.

**3. Murder in the First Degree—Evidence Sufficient.**

See evidence held amply sufficient to support a judgment of conviction for murder in the first degree with penalty assessed at death.

APPEAL from the Criminal District Court of Harris. Tried below before Hon. E. D. CAVIN.

Appeal from a conviction for murder in the first degree; penalty, death.

The indictment charged appellant with the murder of Emelie Meyer, on the 18th day of July, 1898, by striking her with an ax and with a hatchet.

Gotlieb Zorn testified: "I was at home near Cypress, in Harris County, Texas, on 18th of July, 1898. Gotlieb Meyer, brother of Henry Meyer, came over to my house. He was full of blood over the face. He was cut in the head and one finger was cut off. I then went over to Henry Meyer's house. I hallooed 'Helloa!' at the gate, and getting no answer went into the yard and house and found Henry Meyer badly cut and speechless, and his wife, Emelie Meyer, dead. Mrs. Meyer's head was mashed in, and she was perfectly dead. She had deep wounds in the face and head. She died from these wounds. Henry Meyer was not quite dead at the time. Henry Meyer remained speechless until he died. There were two children in the house (children of Henry and Emelie

Meyer). Both were living, but the oldest had been hit in the head with a hatchet. One child was about two years old and the other about seven months old. Neither of the children were then dead. It was about 2:30 o'clock p. m., when I went to Henry Meyer's house on July 18, 1898. Henry Meyer, Emelie Meyer, and their said two-year-old child are now dead. I went over to Henry Meyer's house, and took my gun with me, as soon as Gotlieb Meyer came over to my house full of blood. I live in sight of Henry Meyer's house. I saw a negro working for Henry Meyer, chopping cotton, in June, 1898. I had not been to Henry Meyer's house for some time before the killing. I did not know the negro's name who worked for Meyer." Witness found an ax in the room at the Meyer house, also a hatchet. The axhandle was bloody. There was no blood on the hatchet. It was a large ax, with a dull edge. Witness was no kin to Meyer nor his wife. "I did not find any clothing, hat, or anything of that sort about the house. The bureau in the house was open and a lot of things out on the floor. Meyer's Winchester was hanging up in the room." Witness here identified the ax and hatchet produced in court as the ones he found in Henry Meyer's house.

Sheriff Anderson testified: "I got to Meyer's house shortly after dark on the day of the killing. Henry and Emelie Meyer were both dead. They were cut in the face and head with some heavy instrument. I found the defendant in San Jacinto County, Texas, two or three weeks after the murder, after looking for him pretty much all over the State of Texas. I found this watch on his person when I arrested him. [Witness here hands a silver watch to district attorney.] I advertised for the prisoner under the name of Pink Hines and Pate Burton. I recognize this cap as one which was brought to my office by a colored man named Jackson. The wounds upon the Meyers' appeared to have been made with an ax. The ax and hatchet here in court were turned over to me at Meyer's house the day of the killing, and I have kept them since and brought them here. Jackson, who brought the cap to the witness, was a brother-in-law of the defendant. Jackson lives near Beauchamp Springs, in this county. I did not find any scar on defendant's hip. I had advertised that the man wanted had a scar on his hip, because I was told that Pate Burton had such a scar. I found no scar on the hip of defendant. I have arrested several negroes on this charge, but all have been released."

Gotlieb Meyer, for the State, testified: "I am 12 years old, and was born in Waller County, Texas. I was never in court before. I do not know any of the jurors, and have not been in Houston often. I was staying with my brother, Henry Meyer, near Cypress, in Harris County, Texas, on July 18, 1898. My father is dead, and my mother lives about two and a half miles from Henry Meyer's place. My brother, Henry Meyer, was married and had two children. Henry Meyer, his wife, Emelie Meyer, and their two-year-old child are dead. They died on July 18, 1898, at their house, near Cypress, in Harris County, Texas. They were killed. I was present. After dinner Henry Meyer and Emelie

Meyer and their two children were lying on the front gallery, asleep, when that man [pointing to defendant, who was seated with three other negro prisoners at the bar] killed them.  I was inside the house, asleep. I was awakened by defendant coming inside the house and assaulting me.  Defendant hit me on the head with the hatchet and cut my finger. While defendant was hitting at me in the room, Mrs. Meyer screamed out on the front gallery, and the defendant then ran out to her, and I raised a window and jumped out and ran to Gotlieb Zorn's house and told him what had happened.  I first saw Burton (the defendant) on Sunday evening.  The killing occurred the next day.  Burton came there to work on Sunday night before the killing on Monday.  Burton has worked for Mr. Meyer before.  He slept on the gallery Sunday night. Next day he helped Mr. Meyer pull fodder till dinner time.  After dinner the Meyers went to sleep on the gallery, where they were killed.  I did not actually see the killing.  When I got back to Meyer's house from Zorn's, Mrs. Meyer and Mr. Meyer were both dead, and the child died three days later.  The cap here shown to me is like the one Burton wore.  I recognize this hatchet and ax produced in court as belonging to Henry Meyer.  They were not bloody before dinner, but were bloody after dinner.  I saw defendant Sunday night and the next morning at breakfast.  After breakfast Henry Meyer and his wife and defendant went to work in the fields.  I stayed at the house to take care of the children.  Burton ate dinner in the kitchen after they came back from pulling fodder.  After dinner Mr. and Mrs. Meyer went out on the gallery to sleep.  I went to sleep in the house.  Burton was lying on the other end of the gallery from the Meyers.  I was aroused by the defendant coming into the room and striking me.  He then had both a knife and hatchet. He struck me first with the hatchet and then with the knife.  I hit and kicked at Burton.  I made no outcry, as I thought if they (the Meyers) were living they would come and help me.  The screaming outside made Burton leave me, and I then jumped out of the window and went to Gotlieb Zorn's.  I did not know exactly what had happened when I left the house.  I did not know that Mr. and Mrs. Meyers were hurt.  I told Zorn that Burton had tried to kill me.  I saw Burton at breakfast time the morning of the killing.  I had no conversation with him.  I handed him some biscuits and asked him if he had enough, and he said that was plenty.  I came to Houston to identify Burton about three weeks after the killing.  When I first saw him in the Houston jail it was in the evening and dark, and I did not then recognize Burton.  Several persons were in the room.  There was a lamp burning in the room.  Willis Dow, colored, was also in the room.  I said I would leave it to Willis Dow.  I identified Burton the next morning.  He had changed his clothes and had on clothes like he wore when the killing was done.  I identified him by the clothes and by his face.  I knew that I was brought to Houston to identify Burton, but that night I could not identify him, and I said I would leave it to Willis Dow until next morning.  I recognized Burton next morning entirely by his face and by the clothes he had on,

which were the same he had on when he did the killing. The reason I wanted to leave Burton's identification to Willis Dow was because I was not quite certain about it. Willis Dow was older than me. I do not remember that Willis Dow told me the man under arrest was Burton. I know Burton now by his looks. I might have recognized Burton next morning if they had not changed his clothes. I know him by his looks and his clothes, too."

Redirect examination: "I did not hear what Burton's name was when he came to work for Mr. Meyer. I saw Burton after dinner cutting a toothpick. I can not tell what kind of knife Burton cut me with. When I came to Houston to identify Burton there was several colored men brought in the room together. That night Burton was dressed in clothes I had never seen before. The next morning Burton was dressed in clothes I had seen him wear before, and I picked him out from among several negroes." On the night before, Willis Dow had picked Burton out, but witness could not then recognize him. "Dow picked him out in my presence the night before. Burton had worked for Dow. That man there [pointing to the defendant] is the same man I picked out that next morning, but I don't know whether he is the same man Dow picked out the night before or not."

Sheriff Anderson, recalled, testified for the State as follows: "I was present when Gotlieb Meyer identified Burton. I had dressed Burton in the clothing that had been given me as the same Burton wore when the Meyers were killed. The shirt was brought to me from Cypress as having been found back of the Meyer field. The shirt and cap fitted Burton. I put the cap on Burton which his brother-in-law, Jackson, gave me." [This cap, Jackson testified, had been left at his house by Burton on Tuesday morning after the killing.]

The defense was an alibi, which was testified to mainly by relatives of defendant.

No brief on file for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of the murder of Emelie Meyer, and his punishment assessed at death, and from this conviction he prosecutes an appeal.

In the motion for a new trial it was urged that the court erred in not charging on alibi. In this respect the charge as given is as follows: "If you entertain a reasonable doubt as to whether defendant was present at the time and place when and where said Emelie Meyer was killed, then find said defendant not guilty." This, as we understand it, is a charge on alibi.

Another ground of the motion is predicated upon the failure of the court to charge the jury "the law relating to the possession of the watch alleged to have belonged to Henry Meyer." The evidence discloses that

the murderer of Emelie Meyer also killed her husband, Henry Meyer, and one of their children, at the same time, and also made a deadly assault upon another young boy, Gotlieb Meyer, who escaped, and subsequently recovered from his wounds. Among other things, it was shown that the defendant had a watch that was shown to have been in the possession of Henry Meyer at the time of the killing. This is the watch in regard to which appellant contends the court should have charged the jury. The contention seems to be that if the identification of defendant as the slayer of deceased was not sufficiently proved by Gotlieb Meyer, or otherwise than by the watch, the court should have instructed the jury "that it was not alone sufficient to connect him with the crime charged in the matter aforesaid." This theory of defendant is based upon the supposition that this was the only evidence in the case that tended to connect him with the murder, if the testimony of Gotlieb Meyer was discredited by the jury. This, in our opinion, would have afforded no reason for the court to have singled out this particular fact, to the exclusion of the other facts in the case, upon the question of identification. He was not only identified by Gotlieb Meyer as being the man, but there are quite a number of other facts and circumstances in the case that tend strongly to identify appellant as the perpetrator of this homicide. We know of no rule that would require the court to single out each of the different facts that tend to identify or connect a party with a crime, and charge upon each separately. If the court were required to charge the jury with reference to the watch, the rule would have been equally as strong with reference to the testimony of Jim Jackson as to the possession of the cap subsequent to the murder, which appellant had prior to the murder obtained from Willis Dow; and also as to the fact that his discarded shirt was found a few hundred yards distant from where the homicide occurred; as well as other circumstances in the case which tended to connect him with this offense.

The remaining question presented by the motion for a new trial is based upon the supposed insufficiency of the evidence of Gotlieb Meyer to identify the defendant as the slayer of the deceased. We do not concede the correctness of this contention. An inspection of the testimony shows the identification of defendant by this witness, and, independent of his testimony, the circumstances are strong and cogent, and, in our opinion, would have justified the conviction of appellant. As we understand this record, the verdict can be sustained alone on the testimony of the witness Gotlieb Meyer, or on the circumstances, aside from this testimony. Certainly there can be no question that the positive and circumstantial evidence together fully support the verdict. The purpose of appellant in the commission of this crime seems to have been robbery. To accomplish this, he slew Henry Meyer, his wife, and one of their children, and attempted to slay the witness Gotlieb Meyer, who fortunately escaped. It is not necessary to reiterate the details of this horrible massacre, but suffice it to say that the record discloses a crime rarely equaled

in atrocity. The jury entertained no reasonable doubt that appellant was the guilty party, and we see no reason to disturb their verdict. The judgment is affirmed.

*Affirmed.*

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]